# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 15, 2013 Session

## TERRI ANN KELLY v. WILLARD REED KELLY

**Appeal from the Circuit Court for Hamilton County**
**No. 11D2052      Jacqueline S. Bolton, Judge**

**No. E2012-02219-COA-R3-CV–FILED-AUGUST 6, 2013**

This appeal arises from a divorce and child custody determination. After 18 years of marriage, Terri Ann Kelly ("Wife") sued Willard Reed Kelly ("Husband") for divorce in the Circuit Court for Hamilton County ("the Trial Court"). The Trial Court, among other things, awarded Wife alimony and custody of the parties' son, Will. Husband appeals, raising several issues. We reverse the Trial Court in its award of custody of Will to Wife. We modify the Trial Court's division of the marital estate and its award of alimony to Wife. Finally, we affirm the Trial Court as to its award of attorney's fees to Wife. We affirm, in part, as modified, and reverse, in part, the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed, in part, as Modified, and, Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., joined. CHARLES D. SUSANO, JR., P.J., filed a dissenting opinion.

Richard A. Schulman and McKinley S. Lundy, Jr., Chattanooga, Tennessee, for the appellant, Willard Reed Kelly.

Jennifer H. Lawrence, Chattanooga, Tennessee, for the appellee, Terri Ann Kelly.

# OPINION

## Background

In October 2011, Wife sued Husband for divorce. In turn, Husband filed an answer and counterclaim. This case was tried over the course of two days in July 2012. Numerous witnesses testified. We will limit our discussion of the evidence to that relevant to the issues on appeal.

Wife, 44, testified. Wife had two children with Husband: Will, 15, and Ann, 13. Husband is a stockbroker by profession. Wife attended the University of Tennessee and has a Bachelor's of Science degree in human ecology, textiles, merchandising and design. Wife worked at Jared's, a retail store, for a period of time before she was married. The most money Wife had ever earned was approximately $37,000 per year when she worked with First American Home Care. By the time of the divorce, Wife was working for minimum wage in Chattanooga. As of trial, Wife was searching for a better job, including one that could pay up to $55,000 per year.

Wife testified to her history with Husband. Wife met Husband at the University of Tennessee around 1988. The parties married in 1992. When the parties' first child, Will, was born, Wife was not working. Apart from a small home business she had with a friend, Wife did not work outside the home until the divorce was filed. The couple lived in Knoxville for a number of years before Husband received a promotion at Legg Mason. Wife and Husband moved to Nashville for four years. Wife stated that she was the primary caretaker of the children throughout this period . According to Wife, in around 2007, Smith Barney bought Legg Mason, and Husband moved to Charlotte to be a branch manager of an office. Wife stated that the couple bought a home in Charlotte for $1.6 million.

Husband then took on a new position in Richmond, Virginia. Wife remained in Charlotte with the children for a year before moving to Richmond. Around this time, the parties' marriage became strained, and Wife suspected Husband of having an affair. Despite the difficulties, Wife moved to Richmond in a bid to save the marriage. However, the couple separated. Throughout this period, Wife was the primary caretaker of the children. Husband attempted in vain to reconcile with Wife through various emails. In 2011, Wife told Husband she wanted to leave Richmond with the children. According to Wife, she relocated to Tennessee but Husband prevented Will from going with Wife. Eventually, Husband moved with Will to Nashville, Tennessee.

Husband, 44, testified. Husband began his career as a trainee stockbroker at

age 22. Husband went on to work for Legg Mason. In his last year in Charlotte, Husband earned around $500,000 per year. Husband acknowledged having an inappropriate relationship with a coworker during the time he split between North Carolina and Virginia. With his problems in his personal life, Husband's superior decided to demote him from his managerial position to stockbroker. This entailed a massive decline in income for Husband. By trial, Husband was working on the last month of a $100,000 per year contract as a stockbroker. In his new position moving forward, Husband was guaranteed only to earn $2,800 per month. This sum was a draw against actual earnings. Husband testified that it would be very difficult to build a new book of business in the future. As of trial, Husband continued to look for a better job.

Wife sought custody of Will. Will's behavioral and educational issues were testified to by Janet Wulff ("Wulff"), a counselor at Brentwood High School. Wulff testified by telephone regarding Will. Wulff stated that Will was a "sweet" kid who, nevertheless, had engaged in certain inappropriate behaviors. According to Wulff, Will was associating with certain unspecified bullies at school. Will received in-school suspensions for his misbehavior. Wulff also asserted that she was a "proponent of kids being with their mom and their siblings" and that "[i]n most cases I think being with mom and siblings . . . seems to be most beneficial."

Will also testified in chambers concerning his wishes. Will testified to a desire to remain with his father. Will expressed a strong desire not to move again.

In July 2012, the Trial Court entered its Memorandum Opinion and Order. The Trial Court divided the marital estate such that Wife received $237,000 in net assets while Husband received a negative $213,541. The Trial Court made a number of factual findings:

Part of Husband's distress in the marriage centered around the enormous amount of money that the parties spent. The parties lived in very nice homes, bought antiques and art. About the time the parties were in Richmond, the Morgan Stanley stock which had been worth well in excess of a million dollars was reverse split. Nine to ten thousand shares became nine hundred shares. Those shares which were able to be liquidated brought $80,000.00 The parties held some restricted stock. The house payment in Charlotte was some $7,000.00 per month plus $1,600.00 on a HELOC to CitiBank. In Exhibit 25 at trial, the Morgan Stanley financial management account of Father indicated that he had over $316,000.00 in living expenses for the year 2011. Deposits which went into the account totaled $643,659.00, withdrawals of $116,00.00, checks written for $458,000.00, credit card activity of $16,000.00 leaving a balance of $47,000.00 at year's end 2011. All of this

occurred though Father had lost his job in April of that year. The spending continued even after the divorce was filed. Father bought a truck for $11,000.00 and two guns for $1,000.00. His average income over a three year period excluding 2012, was well over $500,00.00. His average earnings for two good years of 2010 and 2011 and the $100,00.00 for 2012, still showed average income of almost $400,000.00. The parties' debts are enormous. There is no doubt that the manager of the parties' finances was Father. He testified he got a $250,000.00 line of credit from Morgan Stanley during the time he was trying to save the parties' home in Charlotte. None has been repaid. He also owes a $100,000.00 debt from a now defunct real estate transaction in Athens, Georgia. He pays $1,000.00 a month on that note. He has a personal line of credit at Bank of America (which Mother cosigned) of approximately $62,000.00. Father got a hardship reduction so he pays $500.00 a month on instead of $2,500.00. (Format modified and footnote omitted)

With respect to alimony, the Trial Court awarded Wife $5,000 per month in transitional alimony for 10 years. Additionally, the Trial Court awarded Wife $10,000 in attorney's fees.

The Trial Court awarded custody of Will to Wife. The parties' daughter, Ann, would remain with Wife. The Trial Court made findings about Will's status:

The Court is very concerned that upon learning that his Wife was to take the children and return back to Chattanooga with them, following several years of marital upheaval, it was Father's position that the Mother had blind-sided him with the divorce. He swept in to keep Will in Richmond. The Court finds that the Father has not been as attentive as he should have been to make sure in this transitional year for Will that he did his homework and studied. The Court finds that the Father did not put his son's best interest first, in that he was more of a buddy to his son than a Father. He did not make the hard choices to disallow Will from social activities when his grades were not good. He did not apparently take seriously the "pranks" which the school deemed "severe." Will was not further disciplined by his Father other than what the school did for inappropriate behavior. Father lacked judgment in some of his responses to his son. The Court finds that the Father lacks the parenting skills necessary to understand the delicate state of a 15 year old boy whose parents have gone through a very difficult time, as well as the entire family.

The Court further finds that it is in the best interest of Will that he remain in the same home with his sibling, Ann, who is just two years younger than he and to whom he opined looks up to him and mimics him. The Court

further finds that the Mother has a large network of family here in Chattanooga to nurture and support Will and that it is the paramount best interest of Will that he be returned to Chattanooga to be reunited with his Mother and sister and the extended family. There is proof in the record that Will would be considered for placement at his sister's school . . . which the Court finds is an excellent placement for Will.

The Trial Court did not implement a parenting plan in its order. Both parties filed motions to alter or amend. In September 2012, the Trial Court entered another order in which it adopted Wife's proposed parenting plan, awarded child support, and, *sua sponte*, changed the category of alimony awarded to Wife from transitional to rehabilitative. Husband filed this appeal.

## **Discussion**

Though not stated exactly as such, Husband raises the following four issues on appeal: 1) whether the Trial Court erred in designating Wife as the primary residential parent as to Will and ordering Will to move from Husband in Nashville to Wife in Chattanooga; 2) whether the Trial Court erred in its division of the marital estate; 3) whether the Trial Court erred in awarding Wife rehabilitative alimony in the amount of $5,000 per month for a period of 10 years; and, 4) whether the Trial Court erred in awarding Wife attorney's fees.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

A number of issues in this appeal involve abuse of discretion. In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several

acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3

(Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

We first address whether the Trial Court erred in designating Wife as the primary residential parent as to Will and ordering Will to move from Husband in Nashville to Wife in Chattanooga. As pertinent to this issue, Tenn. Code Ann. § 36-6-106 provides:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers;

-7-

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

   (B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred….

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a) (Supp. 2012).

Pursuant to Tenn. Code Ann. § 36-6-404, when entering a permanent parenting plan a court, if the limitations of § 36-6-406 are not dispositive of the residential schedule, also shall consider:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b) (2010).[1]

The Trial Court found that it was in Will's best interest to return to Chattanooga to his mother. From our review of the record, it is apparent that Will's time in Nashville has been less than flawless. Will's grades have been somewhat mediocre, and he

---

[1]The Trial Court utilized Tenn. Code Ann. § 36-6-106, containing similar factors.

has had disciplinary issues. Nevertheless, several facts weigh against the Trial Court's best interest finding.

First, insofar as the Trial Court relied on the testimony of the counselor, Wulff, and it is clear that the Trial Court did so, we believe this was in error. First, we observe that Wulff testified via telephone. As we have noted regarding the determination of witness credibility, "[A trial court] has a distinct advantage over us: it sees the witnesses *in person*. Unlike an appellate court-which is limited to a "cold" transcript of the evidence and exhibits-the trial court is in a position to observe the demeanor of the witnesses as they testify." *Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418, at *4 (Tenn. Ct. App. Dec. 30, 2003), *no appl. perm. appeal filed.* Here, the Trial Court lacked the ability to view Wulff testify, thus reducing its ability to weigh her credibility as a witness, and we, therefore, are free to make our own credibility determination as to Wulff. There were several weaknesses to Wulff's testimony. For example, Wulff did not even know that Will was involved in Young Life, a Christian youth organization. Perhaps most undermining of all to her credibility, Wulff admitted that she was "a proponent" of children going with their mothers, thus exhibiting a clear bias in the matter.

On the other hand, there is Will's unequivocal testimony that he wishes to remain in Nashville. There was considerable evidence presented concerning Will's positive bond and relationship with his father, Husband. Further, there is the need for this young person to finally have some stability following years of movement and the turbulence created by his parents' marital discord.

The Trial Court, in its findings regarding Will, stated that "The Court is very concerned that upon learning that his Wife was to take the children and return back to Chattanooga with them . . . it was Father's position that the Mother had blind-sided him with the divorce. He swept in to keep Will in Richmond." We are puzzled by the Trial Court's reasoning on this point. Husband's 'swooping' in to keep Will is no more offensive or less understandable than Wife's efforts to keep Will with her. It would hardly be a superior alternative were Husband to have been indifferent to keeping Will.

We find that the evidence clearly preponderates against the Trial Court's best interest finding as to Will. We reverse the Trial Court in its award of custody of Will to Wife. On remand, the Trial Court is instructed to enter a new Permanent Parenting Plan designating Husband as the primary residential parent of Will. The new Permanent Parenting Plan will need to address all other changes necessarily resulting from this change of Will's primary residential parent from Wife to Husband.

We next address whether the Trial Court erred in its division of the marital

estate. As our Supreme Court has explained:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

> * * *

> In a proceeding for divorce or legal separation, the trial court is authorized, prior to determining the support and maintenance of one party by the other, to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1) (2005). The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate. *See Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). The division of assets is not a mechanical process and trial courts are afforded considerable discretion. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001).

*Keyt v. Keyt*, 244 S.W.3d 321, 327-28 (Tenn. 2007) (footnote omitted).

Further, our Supreme Court has instructed:

[M]arital property must be divided equitably between the parties based on the

relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c) without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). Section 36-4-121(a)(1) requires an *equitable* division of marital property, not an *equal* division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010).

Tennessee Code Annotated § 36-4-121 (c) provides:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between

the parties.

Tenn. Code Ann. § 36-4-121 (c) (Supp. 2012)

We first point out the tremendous imbalance in the Trial Court's division of the marital estate. Wife was awarded approximately 1,000% of the actual marital estate, the net worth of which is approximately only $25,000. Meanwhile, Husband is left with staggering debts. Indeed, the Trial Court awarded Wife even more than she apparently requested. Divisions of marital estates are to be equitable, not necessarily equal. Nevertheless, we do not believe this gigantic imbalance is equitable. While the Trial Court made certain findings concerning Husband's expenditures during the twilight of the parties' marriage, this still does not justify such a disproportionate division. What is clear from the evidence is that these parties, despite Husband's significant earnings during the marriage, have a marital estate with a net value of around $25,000. This was the result of the parties' lifestyle and several financial reversals. As the Trial Court found, "[t]he parties lived a lavish lifestyle" and spent "an enormous amount of money."

We believe a different, more equitable division is appropriate. Husband clearly was the dominant financial driver in the marriage. While several of Husband's financial decisions resulted in losses, it is inappropriate to saddle him with all those losses just as it would be inappropriate to award him all the gains if they had been successful. Those losses are a part of the marital estate just as are any gains.

Given all the relevant factors in light of the evidence, it is, however, reasonable that Wife receive a greater share of the marital estate. We modify the Trial Court's property division by awarding the following assets to Husband instead of Wife: the Morgan Stanley 401k ($71,756) and the Morgan Stanley IRA #8101A-14 ($106,548). This leaves Wife with $85,244 in net assets, and Husband with negative $61,785. This represents an equitable distribution. We are not unmindful that Wife still is receiving over 300% of the actual value of the marital estate, but we believe this to be an equitable division given all the relevant factors and evidence.

We next address whether the Trial Court erred in awarding Wife rehabilitative alimony in the amount of $5,000 per month for a period of 10 years. As pertinent to this issue, our Supreme Court has explained:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her

support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor . . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

***

[R]ehabilitative alimony is intended to assist an economically disadvantaged

spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn.Code Ann. § 36–5–121(e)(1). *See also Robertson*, 76 S.W.3d at 340–41; *Riggs*, 250 S.W.3d at 456 n. 4. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. *Robertson*, 76 S.W.3d at 340–41; *Isbell v. Isbell*, 816 S.W.2d 735, 738–39 (Tenn. 1991). This purpose is markedly different than the purpose of alimony in futuro, which is to provide long-term support when the economically disadvantaged spouse is unable to achieve self-sufficiency. *Kinard*, 986 S.W.2d at 234.

The fourth category of support, transitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36–5–121(d)(4), (g)(1); *Riggs*, 250 S.W.3d at 456 n. 5. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills*, No. M2009–02474–COA–R3–CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010); *see also Montgomery v. Silberman*, No. M2009–00853–COA–R3–CV, 2009 WL 4113669, at *2 (Tenn.Ct.App. Nov. 24, 2009) (affirming trial court's award of transitional alimony to wife "to bridge the gap, so to speak, between her married life and single life"); *Engesser v. Engesser*, 42 So.3d 249, 251 (Fla. Dist. Ct. App. 2010) (en banc) (describing transitional alimony as "[b]ridge-the-gap alimony" designed to "smooth the transition of a spouse from married to single life"). In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. As such, transitional alimony is a form of short-term support. Transitional alimony is payable for a definite period of time and may be modified only upon certain circumstances: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree; or (3) the recipient spouse resides with a third person following the divorce. Tenn.Code Ann. § 36–5–121(g)(2).

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06, 108-09 (Tenn. 2011) (footnote omitted).

We refer to a number of statutory factors in determining the nature and amount of alimony:

(1)     The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2)     The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)     The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)     The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121 (i) (Supp. 2012).

When reviewing the alimony award in this case, certain major factors stand out. First, the proof is such that, as of the trial in this case, Husband's income was greatly reduced from its previous heights. Though Husband may well regain something akin to his previous significant earnings, this is not in the record before us. On the other side, Wife predominantly has not worked during the marriage, and as of trial had a low-paying job in Chattanooga. Wife has not been able to readily translate the skills from her education into significantly income producing work. Without question, the proof shows that Husband does

have a much higher "relative earning capacity" than Wife.

Wife cites our opinion, *Jannerbo v. Jannerbo*, No. E2011–00416–COA–R3–CV, 2012 WL 762502 (Tenn. Ct. App. March 9, 2012), *no appl. perm. appeal filed*, to support the proposition that the rehabilitative award in this case was justified. In *Jannerbo*, the parties were in their early 40s. *Id*. At *3. The wife had a college degree but did not earn much income. *Id*. at **1-2. The husband in *Jannerbo* earned $275,000 per year and was an equity partner at a law firm. *Id*. At *4. We modified the trial court's award of periodic alimony from $7,000 per month to ultimately $5,000 per month in rehabilitative alimony for a period of 10 years from the date of the court's judgment. *Id*. at *11.

The instant case is distinguishable from *Jannerbo*. We simply cannot ignore the evidence of the large reduction in Husband's actual earnings. In addition, Wife, a healthy individual in her forties with a college education, is in a fair position to achieve self-reliance. The parties likely may never attain their previous lavish lifestyle apart. Considering all the relevant factors in light of the evidence, we modify Wife's alimony award to be $5,000 per month for 4 years and then $3,000 per month for an additional 4 years. We also modify the category of alimony from rehabilitative to transitional as there was little, if any, proof presented concerning Wife's acquiring any additional education or training.

We finally address whether the Trial Court erred in awarding Wife attorney's fees. With respect to the award of attorney's fees in divorce cases, our Supreme Court has stated:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36–5–121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or the spouse would be required to deplete his or her resources in order to pay them. Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony.

*Gonsewski*, 350 S.W.3d at 113 (citations omitted).

From the record, it appears Wife's financial status is such that she cannot readily pay her attorney's fees. Meanwhile, Husband, while clearly not as affluent as he previously has been, has the ability to pay Wife's attorney's fees. The Trial Court's award of attorney's fees in this case is reasonable. We find no reversible error in the Trial Court's award of attorney's fees to Wife.

**Conclusion**

The judgment of the Trial Court is affirmed in part, as modified, and, reversed, in part. This matter is remanded to the Trial Court for further proceedings consistent with this Opinion and for the collection of costs below. The costs on appeal are assessed one-half against the Appellant, Willard Reed Kelly, and his surety, if any, and, one-half against the Appellee, Terri Ann Kelly.

_____
D. MICHAEL SWINEY, JUDGE